JEANETTE ANN ROSEMANN, WIFE AND DEPENDENT OF FREDERICK J. ROSEMANN, APPELLANT, V. COUNTY OF SARPY, NEBRASKA, APPELLEE.

466 N.W.2d 59

Filed February 15, 1991.    No. 90-214.

Richard J. Rensch, of Raynor, Rensch & Pfeiffer, for appellant.

Patrick B. Donahue, of Cassem, Tierney, Adams, Gotch & Douglas, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

Jeanette Ann Rosemann appeals from the order of dismissal by the Nebraska Workers' Compensation Court in an action against the County of Sarpy. We affirm.

## STANDARD OF REVIEW

"Findings of fact made by the Nebraska Workers' Compensation Court after rehearing have the same force and effect as a jury verdict in a civil case. . . . In testing the sufficiency of evidence to support findings of fact made by the Nebraska Workers' Compensation Court after rehearing, the evidence must be considered in the light most favorable to the successful party. . . . Factual determinations by the Workers' Compensation Court will not be set aside on appeal unless such determinations are clearly erroneous. Regarding facts determined and findings made after rehearing in the Workers' Compensation Court, § 48-185 precludes the Supreme Court's substitution of its view of facts for that of the Workers' Compensation Court if the record contains evidence to substantiate the factual conclusions reached

by the Workers' Compensation Court. . . . As the trier of fact, the Nebraska Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given testimony."
*Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 460-61, 461 N.W.2d 565, 568 (1990). Accord, *Fees v. Rivett Lumber Co.*, 228 Neb. 617, 423 N.W.2d 483 (1988); *Mendoza v. Omaha Meat Processors*, 225 Neb. 771, 408 N.W.2d 280 (1987). See, also, Neb. Rev. Stat. § 48-185 (Reissue 1988).

## BACKGROUND OF THE ROSEMANN CLAIM

Jeanette Ann Rosemann is the widow of Frederick J. Rosemann, a former Sarpy County deputy sheriff who held the rank of sergeant and worked at the Sarpy County jail. On May 5, 1987, Sergeant Rosemann injured his left rotator cuff and arm during the course of his employment when he caught a falling truck tire and thereby prevented injury to a jail inmate. By July 6, 1987, Rosemann had fully recovered from his May 5 injury. Rosemann's medical bills from that injury were paid by the insurance company which provided workers' compensation coverage for Sarpy County.

For no apparent reason, on March 11, 1988, Frederick Rosemann began experiencing pain in his left shoulder, pain which intermittently persisted until March 18, 1988, when Capt. Daniel Williamson of the sheriff's department assigned Sergeant Rosemann to another office in the sheriff's headquarters and directed him to move all the furniture from Rosemann's old office into his new office in the headquarters. Cpl. Arthur Dudley observed Rosemann's attempt to push a 157-pound desk from Rosemann's old office to the new office and offered to help. Corporal Dudley and Rosemann then maneuvered the desk through the doorway of Rosemann's old office, pushed the desk 90 feet down the hall into another office, and moved a bookcase and filing cabinets from Rosemann's old office to his new office. At the conclusion of the furniture-moving project, neither Dudley nor Rosemann was out of breath or complained of overexertion.

Later on March 18, after the furniture had been moved to Rosemann's new office, Captain Williamson, while visiting

with Rosemann, noticed that Rosemann was pale and was rubbing his left shoulder and rotating his arm. Believing that Rosemann had aggravated his previously injured left rotator cuff, Williamson sent Rosemann home at approximately 3:30 p.m.

Throughout the evening of March 18, Rosemann's shoulder pain increased, continued notwithstanding medication, and prompted him to go to a hospital emergency room. Rosemann arrived at the hospital at 12:24 a.m. on March 19 and told the emergency room physician that he had been suffering pain in his left shoulder for a week, that the pain had been increasing and was not alleviated by medication, that he had previously sustained a rotator cuff injury, and that he was unaware of any recent injury. The emergency room physician found that Rosemann's left shoulder was tender on palpation and that Rosemann's shoulder pain was aggravated with palm-up abduction of his left arm to a horizontal position. The physician diagnosed Rosemann's condition as left rotator cuff syndrome, treated him accordingly, and released him.

After recuperating at home for a few days, Rosemann returned to work, but, while at home around 8 p.m. on March 22, after a relatively uneventful day, Rosemann experienced excruciating pain in the upper left part of his body, suffered a myocardial infarction, collapsed, and died in the bathroom of his home.

## MEDICAL EVIDENCE AND DISPOSITION AT REHEARING

The emergency room physician testified regarding his diagnosis of Rosemann on March 19, 1988:

Q. What diagnosis did you make at that time, if any?

A. Left rotator cuff syndrome.

Q. Doctor, could you state with a reasonable degree of medical certainty or probability that had you not been made aware of Mr. Rosemann's left rotator cuff shoulder problem from 1987, that your diagnosis and treatment of Mr. Rosemann would have been anything different at the time that you saw him?

. . . .

THE WITNESS: If I understand your question, you are asking me, would my interpretation of his complaint and physical findings been different had I not known about his previous shoulder difficulties?

Q. . . . That's right.

A. I think not. I think it would have been the same.

Dr. Jerry Jones, the pathologist who had performed the autopsy on Rosemann and prepared his death certificate, concluded that Rosemann died of "[a]cute and healing myocardial infarcts, posterior wall left ventricle [resulting from] [s]evere coronary atherosclerosis, with recent thrombosis, right coronary artery." According to Dr. Jones, "approximately 24 hours or less before [Rosemann's] death, he sustained [an] acute myocardial infarct . . . and it was this . . . acute myocardial infarct that really triggered the cardiac arrhythmia that caused his immediate death."

Dr. Bruce McManus, a cardiac pathologist, testified that

[t]he proximate cause of death in this man's case is acute myocardial infarction, and that acute myocardial infarction is the heart attack that occurred just immediately before his death, which is of substantial size and . . . is somewhere between, is around 12 hours, plus or minus a couple, three hours, of age.

Dr. Michael Sketch, a cardiologist, testified that none of Rosemann's activities of March 18, 1988, caused or contributed to Rosemann's death. Dr. Sketch also testified that Rosemann's prior medical history, obtained when Rosemann came to the emergency room on March 19, 1988, did not "mask" Rosemann's coronary problem, "[b]ecause with myocardial infarctions, they do not cause tenderness to be present, and they don't cause pain to be experienced by the individual being examined with adduction."

The Nebraska Workers' Compensation Court found that evidence for the Rosemann claim "failed to prove . . . a causal connection between the rotator cuff injury and the heart attack," and also found that "[t]he plaintiff has failed to sustain her burden of proof" and dismissed Jeanette Ann Rosemann's action for workers' compensation.

## ROSEMANN'S THEORY OF "MASKING"

"Accident" is statutorily defined as "an unexpected or unforeseen injury happening suddenly and violently . . . and producing at the time objective symptoms of an injury. The claimant shall have a burden of proof to establish by a preponderance of the evidence that such unexpected or unforeseen injury was in fact caused by the employment." Neb. Rev. Stat. § 48-151(2) (Reissue 1988). Section 48-151(5) provides: "Death, when mentioned as a basis for the right to compensation, shall mean only death resulting from such violence and its resultant effects or from occupational disease." Further, § 48-151(4) in part states: "The terms ['injury' and 'personal injuries'] shall not be construed to include disability or death due to natural causes but occurring while the employee is at work, nor to mean an injury, disability, or death that is the result of a natural progression of any preexisting condition."

For an award based on an employee's death, a claimant must establish, by a preponderance of the evidence, that the employment proximately caused an injury which resulted in death compensable under the Nebraska Workers' Compensation Act. See, *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 461 N.W.2d 565 (1990); *Grauerholz v. Cornhusker Packing Co.*, 230 Neb. 641, 432 N.W.2d 831 (1988). A claimant has the burden to show the cause-and-effect relationship involving employment, an industrial injury, and disability or death. *Heiliger v. Walters & Heiliger Electric, Inc., supra*; *Sellens v. Allen Products Co., Inc.*, 206 Neb. 506, 293 N.W.2d 415 (1980). "Determination of causation is, ordinarily, a matter for the trier of fact." *Mendoza v. Omaha Meat Processors*, 225 Neb. 771, 778, 408 N.W.2d 280, 285 (1987). Accord *Heiliger v. Walters & Heiliger Electric, Inc., supra*.

It is undisputed that Frederick Rosemann's rotator cuff injury from the truck tire accident on May 5, 1987, was a work-related injury compensable under the Nebraska Workers' Compensation Act. Therefore, the issue is whether Frederick Rosemann's death was caused by "such violence [of Rosemann's work-related injury] and its resultant effects." § 48-151(5).

To meet a claimant's burden of proof concerning causation,

Jeanette Ann Rosemann asserts that "the primary compensable injury made treatment of Fred's ischemic heart disease extremely difficult, if not impossible, by making Fred's heart symptoms undetectable, unrecognizable, unnoticeable or masking over them." Brief for appellant at 17. Thus, Jeanette Ann Rosemann contends that symptoms of her husband's aggravated rotator cuff injury were indistinguishable from the symptoms of a myocardial infarction, so that the rotator cuff condition disguised or masked the symptoms of her husband's myocardial infarction and prevented an early and proper diagnosis of Frederick Rosemann's coronary condition during the emergency room examination on March 19, 1988. To support her position, Jeanette Ann Rosemann directs our attention to the proposition expressed in 1 A. Larson, The Law of Workmen's Compensation § 13.00 at 3-502 (1990): "When the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment, unless it is the result of an independent intervening cause attributable to claimant's own intentional conduct."

Professor Larson also makes the following observation:

> A distinction must be observed between causation rules affecting the primary injury . . . and causation rules that determine how far the range of compensable consequences is carried, once the primary injury is causally connected with the employment. . . . [W]hen the question is whether compensability should be extended to a subsequent injury or aggravation related in some way to the primary injury, the rules that come into play are essentially based upon the concepts of "direct and natural results," and of claimant's own conduct as an independent intervening cause.

1 A. Larson, *supra*, § 13.11 at 3-502.

In his treatise, Professor Larson notes a group of medical-causation cases

> in which the existence of the primary compensable injury in some way exacerbates the effects of an independent medical weakness or disease. The causal sequence in these cases may be more indirect or complex, but as long as the

causal connection is in fact present the compensability of the subsequent condition is beyond question.

1 A. Larson, *supra*, § 13.11(b) at 3-523 to 3-524.

In *Ribar v. H & S Earthmovers*, 618 P.2d 582 (Alaska 1980), the court considered an employee's contention that symptoms from a compensable injury misled the employee's attending physician, resulted in misinterpretation of symptoms from a prior preexisting condition, and caused "his physicians to act differently than they would have had his accident not taken place." 618 P.2d at 584 n.2. In *Ribar*, the court stated:

> We think that it makes little difference whether an industrial accident causes a delayed diagnosis of an underlying condition by actually concealing the symptoms of the condition or by merely causing confusion in the mind of the treating physician. In each case the condition is not discovered and appropriately treated because of the accident. The question in both cases is the same: was the accident a substantial factor in contributing to the applicant's condition in the sense that it delayed prior diagnosis and treatment of the [preexisting condition].

618 P.2d at 584. See, also, *Waibel v. State Compensation Department*, 471 P.2d 826, 829 (Or. App. 1970) (Hodgkin's disease antedated industrial accident, so that the work-related "injury masked the Hodgkin's disease symptoms, delaying treatment for the Hodgkin's disease and thus hastening the advent of [Waibel's] total disability"); *Namanowich v. En Operating Corporation*, 23 A.D.2d 912, 258 N.Y.S.2d 937 (1965), *aff'd* 17 N.Y.2d 642, 216 N.E.2d 342, 269 N.Y.S.2d 140 (1966) (employee's previous work-related injuries prevented a timely diagnosis of cancer and prevented curative or palliative surgery).

In the case before us, for availability of the "masking" theory, Rosemann's symptoms, as the basis for the rotator cuff diagnosis during the emergency room examination, would also have to be symptoms of a myocardial infarction. However, Dr. Sketch offered the opinion that the symptoms exhibited by Rosemann at the emergency room on March 19, 1988, were inconsistent with a myocardial infarction and negated existence of that particular coronary condition at the time Rosemann was

treated in the emergency room. To paraphrase Dr. Sketch's opinion, what Rosemann exhibited at the emergency room were not symptoms of a myocardial infarction. Thus, evidence supports a factual conclusion that Rosemann's symptoms at the emergency room were not related to a myocardial infarction. For that reason, symptoms attributable to Rosemann's prior rotator cuff injury could not and, therefore, did not distort, camouflage, or overshadow nonexistent symptoms of a myocardial infarction. Moreover, according to the emergency room physician, the interpretation of Rosemann's clinical symptoms and the diagnosis of Rosemann's condition, namely, a rotator cuff problem, would have been the same without the history of Rosemann's prior work-related rotator cuff injury. In short, a cause-and-effect relationship between Rosemann's rotator cuff injury and absence of a diagnosis of Rosemann's coronary problem has not been established, or, as the Workers' Compensation Court concluded, evidence failed to show a "causal connection between the rotator cuff injury and the heart attack," a determination which is not clearly erroneous. Since the evidence failed to establish that the rotator cuff injury delayed a proper diagnosis of Rosemann's coronary condition, caused an incorrect diagnosis, or resulted in absence of a diagnosis concerning Rosemann's eventual death-producing myocardial infarction, Rosemann's death was not one of the "resultant effects" of the work-related rotator cuff injury.

## ROSEMANN'S EXERTION

Although the Rosemann appeal concentrates on "masking" to provide compensability for Frederick Rosemann's death, Jeanette Ann Rosemann also contends that Frederick Rosemann's physical exertion in moving office furniture in the course of his employment "substantially increased the risk created by [his] pre-existing, but unknown, arterial sclerosis and precipitated or contributed in a substantial and material degree to the heart attack suffered by [Frederick Rosemann] on March 22, 1988, which resulted in his death."

Frederick Rosemann and Corporal Dudley moved the furniture by sliding, not carrying, the items from Rosemann's old office. After moving the furniture, Dudley and Rosemann

were not out of breath and did not complain about overexertion. Rosemann's physical activities outside his employment included repairing automobiles, installing major household appliances, constructing a deck for his residence, adding kitchen cabinets in his house, painting and wallpapering in his home, and deer hunting. Beyond general references to the preceding activities, no evidence indicated whether exertion from Rosemann's employment activities was greater than exertion experienced in his nonemployment life or vice versa.

Neb. Rev. Stat. § 48-101 (Reissue 1988), provides that

> [w]hen personal injury is caused to an employee by accident or occupational disease, arising out of and in the course of his or her employment, such employee shall receive compensation therefor from his or her employer if the employee was not willfully negligent at the time of receiving such injury.

"There shall be no presumption from the mere occurrence of [an] unexpected or unforeseen injury that the injury was in fact caused by the employment." § 48-151(2).

Sections 48-101 and 48-151(2) of the Nebraska Workers' Compensation Act reflect a basic legislative intent that compensation is restricted to an employee's work-related injury and disability.

In § 48-101, the phrase "arising out of" refers to an injury which is the basis of a workers' compensation claim and the injury's origin, cause, and character, that is, whether an employee's unexpected or unforeseen injury results from risks arising within the scope or sphere of employment. See, *McGinn v. Douglas County Social Services Admin.*, 211 Neb. 72, 317 N.W.2d 764 (1982); *Union Packing Co. v. Klauschie*, 210 Neb. 331, 314 N.W.2d 25 (1982); *Stoll v. School Dist. (No. 1) of Lincoln*, 207 Neb. 670, 301 N.W.2d 68 (1981).

> [A] claimant is entitled to an award under the Workers' Compensation Act for a work-related injury and disability if the claimant shows, by a preponderance of evidence, that the claimant sustained an injury and disability proximately caused by an accident which arose out of and in the course of the claimant's employment, even though a preexisting disability or condition has

combined with the present work-related injury to produce the disability for which the claimant seeks an award.

*Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 467, 461 N.W.2d 565, 571-72 (1990).

However, notwithstanding the principle expressed in *Heiliger* regarding a preexisting condition, "heart attack" cases occupy a special place in the workers' compensation law of Nebraska. The cardiovascular catastrophe of a myocardial infarction, commonly known as a heart attack, results from cardiac ischemia, that is, insufficient blood supply to heart tissue, which, if severe enough and protracted, produces death of heart muscle. D. Juge & J. Phillips, *A New Standard for Cardiovascular Claims in Workers' Compensation*, 43 La. L. Rev. 17 (1982). Quite obviously, in any heart attack case brought under the Nebraska Workers' Compensation Act the foremost and essential problem is causation, that is, whether employment caused an employee's injury or death from a heart attack. See *Sellens v. Allen Products Co., Inc.*, 206 Neb. 506, 293 N.W.2d 415 (1980).

In a workers' compensation claim based on an employee's heart attack, causation required for compensability consists of two parts: legal cause and medical cause. See, *Leitz v. Roberts Dairy, ante* p. 235, 465 N.W.2d 601 (1991); *Sellens v. Allen Products Co., Inc., supra;* 1B A. Larson, The Law of Workmen's Compensation § 38.83(a) (1987). For legal causation, the workers' compensation law defines the type of exertion which satisfies "arising out of" employment as a requirement for compensability. See, *Leitz v. Roberts Dairy, supra*; *Sellens v. Allen Products Co., Inc., supra*; 1B A. Larson, *supra*. For medical causation, medical evidence must establish that an employee's exertion in fact caused an employee's heart attack which is the subject of a workers' compensation claim. *Leitz v. Roberts Dairy, supra*; 1B A. Larson, *supra*. See, also, *DeSchaaf v. Indus. Com'n of Ariz.*, 141 Ariz. 318, 320, 686 P.2d 1288, 1290 (1984): "Legal causation concerns whether the injury arose out of and in the course of the employment. . . . [M]edical causation ordinarily requires expert medical testimony to establish that the industrial accident caused the injury."

An exertion- or stress-caused heart injury to which the claimant's preexisting heart disease or condition contributes is compensable only if the claimant shows that the exertion or stress encountered during employment is greater than that experienced during the ordinary nonemployment life of the employee or any other person.

*Leitz v. Roberts Dairy, supra* at 241, 465 N.W.2d at 605. See, also, *Spangler v. State,* 233 Neb. 790, 448 N.W.2d 145 (1989); *Sellens v. Allen Products Co., Inc., supra*; *Beck v. State*, 184 Neb. 477, 168 N.W.2d 532 (1969).

As previously noted, Dr. Sketch, a cardiologist, testified that none of Rosemann's activities on March 18, 1988, caused or contributed to Rosemann's death. Hence, the compensation court's decision that Jeanette Ann Rosemann had failed to satisfy her burden of proof that Frederick Rosemann's employment activities were the medical cause of the fatal myocardial infarction is not clearly erroneous. Also, nothing in Rosemann's case provided a reasonable factual basis for a comparative evaluation between the exertion in Frederick Rosemann's employment and exertion in nonemployment life. Although there is a rather general identification of Frederick Rosemann's various activities in his nonemployment life, the identified activities offer no factual foundation for a comparison between the exertion experienced in Frederick Rosemann's employment as a deputy sheriff and exertion experienced in nonemployment life. Thus, the proof in Rosemann's case fails to establish that his myocardial infarction arose out of his employment as a deputy sheriff of Sarpy County.

AFFIRMED.