rights were not violated and that there was sufficient evidence to support the trial court's finding that Meints was guilty on such counts beyond a reasonable doubt. We find that the Beatrice City Code does not contradict state law and does not criminalize conduct which is lawful under any state statute. We also find that multiple prosecutions for the violations of the Beatrice City Code do not violate the Double Jeopardy Clause of the Fifth Amendment. We affirm the decision of the district court.

AFFIRMED.

---

Stacy Bolles, wife of Gregory Bolles, deceased, on her behalf and on behalf of others eligible for benefits pursuant to Neb. Rev. Stat. § 48-122 et seq., appellee, v. Midwest Sheet Metal Co., Inc., appellant.

___ N.W.2d ___

Filed March 11, 2014.    No. A-13-203.

1. **Workers' Compensation: Judgments: Evidence: Appeal and Error.** Under Neb. Rev. Stat. § 48-185 (Reissue 2010), a judgment of the Workers' Compensation Court may be modified, reversed, or set aside based on the ground that there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award.
2. **Workers' Compensation: Appeal and Error.** In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court, an appellate court will not disturb the findings of fact of the trial judge unless clearly wrong.
3. **Workers' Compensation: Evidence: Appeal and Error.** In testing the sufficiency of the evidence to support the findings of fact by the Workers' Compensation Court, the evidence is considered in the light most favorable to the successful party, every controverted fact is resolved in favor of the successful party, and the successful party has the benefit of every inference that is reasonably deducible from the evidence.
4. **Workers' Compensation: Judgments: Evidence: Appeal and Error.** Workers' Comp. Ct. R. of Proc. 11(A) (2011) requires the Workers' Compensation Court to write decisions that provide the basis for a meaningful appellate review.
5. ____: ____: ____: ____. Workers' Comp. Ct. R. of Proc. 11(A) (2011) requires the judge to specify the evidence upon which the judge relies.

6. **Workers' Compensation.** When a workers' compensation claimant has suffered a heart attack, the foremost and essential problem is causation, that is, whether the employment caused an employee's injury or death from a heart attack.

7. **Workers' Compensation: Appeal and Error.** The issue in regard to causation of an injury or disability is one for determination by the fact finder, whose findings will not be set aside unless clearly erroneous.

8. **Workers' Compensation.** In workers' compensation cases, the heart injury causation issue consists of two elements: (1) legal causation and (2) medical causation. Under the legal test, the law must define what kind of exertion satisfies the test of arising out of the employment. Under the medical test, the doctors must say whether the exertion (having been held legally sufficient to support compensation) in fact caused the collapse.

9. **Workers' Compensation: Proof.** An exertion- or stress-caused heart injury to which the claimant's preexisting heart disease or condition contributes is compensable only if the claimant shows that the exertion or stress encountered during employment is greater than that experienced during the ordinary nonemployment life of the employee or any other person.

10. ____: ____. If it is claimed that an injury was the result of stress or exertion in the employment, medical causation is established by a showing by the preponderance of the evidence that the employment contributed in some material and substantial degree to cause the injury.

Appeal from the Workers' Compensation Court: John R. Hoffert, Judge. Affirmed.

Darla S. Ideus, of Baylor, Evnen, Curtiss, Grimit & Witt, L.L.P., for appellant.

John C. Fowles, of Fowles Law Office, P.C., L.L.O., and John F. Vipperman, of Anderson, Vipperman & Kovanda, for appellee.

Irwin, Pirtle, and Bishop, Judges.

Irwin, Judge.

# I. INTRODUCTION

Gregory Bolles suffered a heart attack while working for Midwest Sheet Metal Co., Inc. (Midwest), and died as a result. Midwest appeals an award of the Nebraska Workers' Compensation Court awarding benefits to Bolles' wife, Stacy Bolles (Stacy). On appeal, Midwest asserts that the compensation court's award did not comply with Workers' Comp. Ct. R. of Proc. 11 (2011), because it contained insufficient factual findings, and asserts that the compensation court erred in

finding that Stacy met her burden of proof with regard to both factual and legal causation. We affirm.

## II. BACKGROUND

### 1. WORK AND INCIDENT

The events giving rise to this cause of action occurred on or about July 27, 2011. On that date, Bolles was employed by Midwest as a foreman. Evidence adduced at trial indicated that Bolles began work on that date at the Midwest shop in Grand Island, Nebraska, at approximately 7 a.m. Bolles ran some errands and picked up some necessary materials, and Bolles and a coworker picked up a compressor for an air-conditioning unit at a supply shop in Grand Island.

There was conflicting evidence about what time Bolles and the coworker arrived at the jobsite for that date, which was in Harvard, Nebraska. There was evidence that they arrived at the jobsite between 9:15 and 9:30 a.m.; there was also evidence that it may have been as late as "around noonish."

Bolles and his coworkers were to replace the compressor in an air-conditioning unit at a nursing home. The evidence adduced at trial indicated that this was a big and time-consuming job. The air-conditioning unit was a large unit, with sheet metal panels on the outside; was situated on two metal rails on concrete slabs; and was located several feet off the ground. The unit was located in a fenced area, with the fencing mostly obscuring the unit from view and shielding it from wind.

When Bolles arrived at the worksite, some of the side panels had been removed. Bolles began working with a screw gun to detach other metal panels. Bolles then climbed up and into the unit and worked inside of it for approximately 1 to 1½ hours. Bolles worked to remove bolts and flanges that kept the compressor in place, and he utilized hand wrenches, ratchets, and screwdrivers to remove the bolts and flanges. There was evidence that Bolles spent the time inside the unit bent over and squatting while removing the bolts and flanges.

Once the compressor was disconnected, Bolles and a coworker attached chains and manipulated the compressor out

of the air-conditioning unit while another coworker operated a front-end loader to actually lift the compressor. The evidence indicates that the compressor that had to be removed weighed as much as 400 pounds. The evidence indicated that Bolles "had to shove it around to clear the pipes" and guide it out of the air-conditioning unit. The process of maneuvering the compressor out of the air-conditioning unit took approximately 30 minutes.

After the compressor was successfully lifted out of the air-conditioning unit, it was placed on the ground. Bolles and his coworkers then removed a variety of other parts, which involved more use of handtools and wrenches.

Parts were then attached to the new compressor, the new compressor was lifted with the front-end loader, and Bolles worked to guide the new compressor into the air-conditioning unit. Bolles was again inside the air-conditioning unit to guide the new compressor into place.

Once the new compressor was inside the air-conditioning unit, all of the bolts and flanges had to be replaced to connect and secure the new compressor. During that time, Bolles was inside the air-conditioning unit and, for the majority of the time, bent over and using handtools to connect the bolts and flanges. Connecting the new compressor took approximately another hour.

After the new compressor was connected and secured, it was discovered that nitrogen was needed. Bolles left the worksite and drove to meet another Midwest employee to pick up additional nitrogen. Bolles met the other employee approximately halfway between Harvard and Hastings, Nebraska; the evidence indicates that the distance between Harvard and Hastings was approximately 18 miles, or approximately a 30-minute drive. Bolles then returned to the worksite in Harvard. Bolles then climbed back up on the air-conditioning unit and worked on reattaching the sheet metal panels on the outside of the unit. Bolles was replacing screws.

A coworker estimated that Bolles had been back at the worksite for anywhere from 15 minutes to 1 hour before he suffered the heart attack. Bolles collapsed and fell from the

air-conditioning unit. Evidence adduced at trial indicates that an ambulance was dispatched to the worksite at approximately 4:20 p.m. Bolles subsequently died.

## 2. Weather Conditions

Evidence adduced at trial demonstrated that the date of this incident, July 27, 2011, was an "extremely hot" day. One of Bolles' coworkers testified that it was "[p]robably one of the hottest days of the year" and that there was "[n]o wind" on that date. He testified that it was "pretty nasty" outside and that it felt "very" humid. He also testified that "[t]here was no air flow in" the area where the air-conditioning unit was located and that there was no shade where Bolles would have been working on the air-conditioning unit.

One of Bolles' coworkers testified that Bolles had worked "pretty much" the whole time that he was at the jobsite, although the workers "took a break and stood in the shade a little bit and drank a little water" on a couple of occasions. Additionally, the work on preparing the new compressor to be installed was performed in a shaded area. The evidence indicates that when Bolles left the worksite to get nitrogen, he drove in an air-conditioned company truck.

One of Bolles' coworkers testified that it was "probably 95 to a hundred" degrees on the date in question. There was evidence adduced concerning the actual meteorological conditions on the date in question, with data presented from Grand Island, Hastings, and Clay Center, Nebraska, all in the geographic vicinity of Harvard. The air temperature in Grand Island between 1 and 6 p.m. on the date in question was consistently between 88 and 89 degrees, which, combined with relative humidity, yielded heat index values of approximately 100 degrees. The air temperature in Hastings between 1 and 6 p.m. on the date in question was consistently between 87 and 89 degrees. A heat index chart indicates that the heat index values in Hastings during that time would have been between 90 and 100 degrees. The air temperature in Clay Center between 1 and 6 p.m. on the date in question was consistently between 87 and 90 degrees, with heat index values between 93 and 102 degrees. The evidence indicates that the heat index numbers

reflected in charts in the record were likely lower than the actual heat index values, because the charts included in the record were based on shaded conditions and because the actual heat index values would be higher in direct sunlight; there was testimony that direct sunlight could actually increase the index values by up to 15 degrees.

### 3. Medical Evidence

The evidence adduced at trial demonstrated that Bolles had a prior history of cardiac health issues. He had suffered a prior heart attack in May 2008, which had resulted in angioplasty and insertion of a stent. Stacy testified that Bolles had suffered from high blood pressure and high cholesterol and that he had been a smoker. She also testified that although he exercised for a couple of months after the 2008 heart attack, he then stopped regularly exercising.

Bolles' daughter testified that Bolles was not involved in aerobic activities. She testified that Bolles liked to sit on the couch and watch television and that she would not have called him an "active person outside of work." She testified that he did not take out the garbage or mow the yard. Bolles' son testified similarly.

There were two medical expert opinions presented to the compensation court. Stacy presented the opinion of Dr. Vincent Di Maio, while Midwest presented the opinion of Dr. Michael Del Core. These two medical expert opinions differed on the question of whether Bolles' work on the date in question constituted a material and substantially contributing factor to his heart attack and death.

Dr. Di Maio's report indicates that he reviewed depositions of Bolles' coworkers, climatological data, Bolles' medical records, and the ambulance records from the date in question. Dr. Di Maio noted the work performed by Bolles on the date in question, as well as the heat and humidity on the date in question. He opined that the stress of working in direct sunlight and the high temperatures and humidity on the date in question were contributing causes to Bolles' heart attack. He opined that "[t]he elevated temperature and humidity put stress on [Bolles'] heart as it tried to counteract the environmental

factors and maintain normal body temperature." Dr. Di Maio opined that Bolles' "body would have taken steps to prevent developing severe hyperthermia" and that "[a] large portion of his blood supply would have been shuttled to vascular complexes under the skin." He opined that Bolles' "[h]eart rate and stroke volume would have been elevated" and that "[t]he strain on the heart would have been sufficient to aggravate an existing heart disease and cause death." Thus, he opined that Bolles' "working in an environment of elevated temperature and humidity was a material and substantial cause in his death."

Dr. Del Core's report indicates that he reviewed Stacy's deposition, Bolles' medical records, weather data, and Dr. Di Maio's report. Dr. Del Core placed emphasis on Bolles' medical history and noted that "[h]is blood pressure and cholesterol were not well controlled, he continued to smoke and he appeared non-compliant with his medications." He also placed emphasis on the evidence that Bolles had spent some amount of time in an air-conditioned vehicle prior to the heart attack. He opined that 15 to 20 minutes of work after being in the air-conditioned vehicle "is simply not enough time to cause an increase in body temperature sufficient to contribute to his heart attack." He indicated that he could not "say with any degree of medical certainty that . . . Bolles' activity on June [sic] 27 was a significant factor." He opined that Bolles' preexisting medical conditions and risk factors "materially and substantially contributed to [his] fatal heart attack" and that he "[did] not believe heat or humidity on that day contributed to his fatal heart attack."

## 4. AWARD

The compensation court noted in its award that the parties had stipulated to Bolles' employment and his average weekly wage. The court noted the specific applicable case law in Nebraska concerning recovery of benefits in compensation cases involving heart attacks suffered at work. The court noted the dual issues of legal and medical causation. The court cited numerous authorities and discussed the standards applicable to legal and medical causation in such cases.

The compensation court also made a number of specific factual findings and findings regarding credibility of witnesses in its award. The court made findings about the specific work performed by Bolles on the date in question and about the weather conditions on the date in question. The findings are consistent with the above factual background, including findings about Bolles' use of various handtools, in a bent-over position inside the air-conditioning unit, in direct sunlight and without airflow, and on a date on which the heat index value "hovered around 100 [degrees] or more" and may have "exceeded 100 degrees." The court also made factual findings about Bolles' nonemployment life and activities, concluding that Bolles lived a largely sedentary life, again consistent with the above factual background.

The compensation court concluded that there had been sufficient evidence adduced to demonstrate that Bolles' employment life involved greater exertion and stress than he experienced in his nonemployment life. The court also concluded that the work activities on the date in question were greater than that experienced in the ordinary nonemployment life of an average person. The court thus concluded that sufficient evidence had been adduced to demonstrate legal causation.

The compensation court evaluated the conflicting medical expert opinions. The court made specific findings concerning some of Dr. Del Core's conclusions, noting that Dr. Del Core's emphasis on concerns about whether Bolles was sufficiently caring for his own "physical well-being" was not shared by a cardiologist who had examined Bolles approximately 3 months prior to this heart attack and had concluded that "'if [Bolles] continue[d] to do well,'" the cardiologist would start seeing Bolles only on an annual basis, rather than twice a year. The court did not find this determinative, but did note that it impacted the weight to be given to Dr. Del Core's opinions. The compensation court also noted that Dr. Del Core had emphasized whether Bolles had been performing work exertion which was greater than his normal work exertion, and it noted some perceived inconsistencies in Dr. Del Core's deposition testimony concerning whether the

heat and humidity were contributing factors or may have been contributing factors.

The compensation court made a credibility determination that Dr. Di Maio's expert opinion "enjoys more persuasive value" and found that although it, too, had some shortcomings, "the Court [found] his overall opinion to be convincing." The court thus concluded that there had been sufficient evidence adduced to demonstrate medical causation.

Having found sufficient evidence to support findings of both legal and medical causation, the compensation court awarded benefits. This appeal followed.

## III. ASSIGNMENTS OF ERROR

On appeal, Midwest asserts that the compensation court's award did not satisfy rule 11 and that the court erred in finding sufficient evidence to support findings of legal and medical causation.

## IV. ANALYSIS

Midwest asserts that the compensation court failed to provide a well-reasoned opinion under rule 11 because the court did not make sufficient factual findings to support its conclusions about causation. Midwest also asserts that the court erred in finding sufficient evidence to support a finding of both legal and medical causation. We find no merit to either assertion.

[1] Under Neb. Rev. Stat. § 48-185 (Reissue 2010), a judgment of the Workers' Compensation Court may be modified, reversed, or set aside based on the ground that there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award. *Pearson v. Archer-Daniels-Midland Milling Co.*, 285 Neb. 568, 828 N.W.2d 154 (2013); *Roness v. Wal-Mart Stores*, 21 Neb. App. 211, 837 N.W.2d 118 (2013). Competent evidence means evidence that tends to establish the fact in issue. *Id.*

[2,3] In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court, an appellate court will not disturb the findings of fact of the

trial judge unless clearly wrong. *Roness v. Wal-Mart Stores,*
*supra.* See *Hynes v. Good Samaritan Hosp.*, 285 Neb. 985, 830
N.W.2d 499 (2013). In testing the sufficiency of the evidence
to support the findings of fact by the Workers' Compensation
Court, the evidence is considered in the light most favorable
to the successful party, every controverted fact is resolved in
favor of the successful party, and the successful party has the
benefit of every inference that is reasonably deducible from
the evidence. *Roness v. Wal-Mart Stores, supra.* See *Pearson v.*
*Archer-Daniels-Midland Milling Co., supra.*

### 1. Rule 11 Challenge

Midwest first asserts that the the compensation court failed
to provide a well-reasoned opinion under rule 11 because the
court did not make sufficient factual findings to support its
conclusions about causation. We disagree.

[4,5] Rule 11(A) requires the Workers' Compensation Court
to write decisions that "provide the basis for a meaningful
appellate review." *Jurgens v. Irwin Indus. Tool Co.*, 20 Neb.
App. 488, 825 N.W.2d 820 (2013). In particular, rule 11(A)
requires the judge to "specify the evidence upon which the
judge relies." *Jurgens v. Irwin Indus. Tool Co., supra.*

In the present case, Midwest asserts that the compensation
court did not make specific findings about precisely how long
Bolles spent working in the heat and humidity on the date in
question, how much of the time was in direct sunlight, the
length of time spent in the air-conditioned truck while get-
ting nitrogen shortly before the heart attack, and the length
of time and duties performed after he returned and before the
heart attack.

Although the compensation court did not make specific
findings on each of these points, the court did make factual
findings concerning the work performed by Bolles on the date
in question. The court made specific findings concerning the
nature of the work as requiring the removal of the bolts and
flanges with handtools, being inside the air-conditioning unit,
being in a bent-over position, and being "essentially performed
in the direct sun with little to no shade." Those findings are

all consistent with evidence adduced at trial, as set forth in the above factual background.

The compensation court made specific findings that Bolles worked in this fashion for 1 to 1½ hours during the portion of the job that involved removing the old compressor. The court made specific findings that the old compressor weighed "approximately 350 pounds" and was located in an area limiting exposure to wind. The court made specific findings that Bolles also engaged in "manual manipulation of the compressor" as it was being lifted out of the air-conditioning unit with a front-end loader. The court made specific findings that the old compressor was placed on the ground, that additional components were removed, and that Bolles engaged in similar activities all over again in placing the new compressor in place and reattaching the bolts and flanges with handtools.

The court also made specific findings that it found Dr. Di Maio's report and conclusions to be more persuasive and more credible than Dr. Del Core's report and conclusions. Dr. Di Maio's report specifically indicated that he had reviewed depositions of Bolles' coworkers, as well as medical records, climatological data, and the ambulance records in reaching his opinions and conclusions.

The compensation court's award in this case provides sufficient detail and explanation of how and why the court reached its decision to allow meaningful review. The court sufficiently specified the facts and evidence upon which it based its decision. We find no merit to the assertion that this award did not comply with rule 11.

### 2. Sufficiency of Evidence on Causation

Midwest next asserts that the compensation court erred in finding that sufficient evidence had been adduced to demonstrate both legal and medical causation. We disagree.

[6,7] When a workers' compensation claimant has suffered a heart attack, the foremost and essential problem is causation, that is, whether the employment caused an employee's injury or death from a heart attack. *Zessin v. Shanahan Mechanical & Elec.*, 251 Neb. 651, 558 N.W.2d 564 (1997); *Rosemann*

*v. County of Sarpy*, 237 Neb. 252, 466 N.W.2d 59 (1991).
See, also, *Toombs v. Driver Mgmt., Inc.*, 248 Neb. 1016, 540
N.W.2d 592 (1995). The issue in regard to causation of an
injury or disability is one for determination by the fact finder,
whose findings will not be set aside unless clearly erroneous.
*Zessin v. Shanahan Mechanical & Elec., supra*; *Leitz v. Roberts
Dairy*, 237 Neb. 235, 465 N.W.2d 601 (1991).

[8] In workers' compensation cases, the heart injury cau-
sation issue consists of two elements: (1) legal causation
and (2) medical causation. *Zessin v. Shanahan Mechanical
& Elec., supra*; *Toombs v. Driver Mgmt., Inc., supra*; *Leitz v.
Roberts Dairy, supra*. Under the legal test, the law must define
what kind of exertion satisfies the test of "arising out of the
employment." *Id*. Under the medical test, the doctors must say
whether the exertion (having been held legally sufficient to
support compensation) in fact caused the collapse. *Id*.

## (a) Legal Causation

[9] When a preexisting disease or condition is present, the
Nebraska Supreme Court has adopted the following test for
legal causation: An exertion- or stress-caused heart injury to
which the claimant's preexisting heart disease or condition
contributes is compensable only if the claimant shows that the
exertion or stress encountered during employment is greater
than that experienced during the ordinary nonemployment life
of the employee or any other person. *Id*.

In the present case, there was evidence adduced to demon-
strate that Bolles arrived at the worksite in Harvard between
9:15 and 9:30 a.m. Bolles, along with two coworkers, engaged
in physical labor to remove a 350- or 400-pound compressor
from an air-conditioning unit, which included climbing up into
the unit and using handtools for 1 to 1½ hours in a bent-over
position to remove numerous bolts and flanges, physically
helping to guide and maneuver the compressor out of the air-
conditioning unit as it was lifted by a front-end loader, remov-
ing additional parts while the compressor was on the ground,
attaching parts to a new compressor, climbing up into the unit
again and physically helping to guide and maneuver the new
compressor into the air-conditioning unit as it was lifted by a

front-end loader, and using handtools for at least another hour in a bent-over position to replace numerous bolts and flanges. There was evidence to suggest that Bolles performed much of this work in direct sunlight, that the air temperature and the heat index values were extremely high throughout the day in question, and that there was little or no airflow where Bolles was working. Although Bolles left the jobsite and traveled in an air-conditioned vehicle to get nitrogen, he had returned to the worksite and worked with handtools to replace metal sheeting for anywhere from 15 minutes to 1 hour immediately prior to the heart attack.

The evidence adduced at trial demonstrated that in his nonemployment life, Bolles did not exert himself. The testimony established that he did not engage in aerobic activity, did not perform tasks such as mowing or taking the garbage out, and generally preferred to sit on the couch and watch television. Although he enjoyed watching his son play baseball, there was evidence that he primarily sat in the bleachers during games and that many of the games were during evening hours and not in the hottest portions of the day.

We determine that the compensation court was not clearly wrong in concluding that Bolles' work activities on the date in question constituted an exertion or stress greater than that experienced during the ordinary nonemployment life of Bolles or any other person. Thus, there is no merit to Midwest's assertion that the evidence was insufficient to support the court's conclusion on legal causation.

### (b) Medical Causation

[10] While legal causation is established by satisfying the "stress greater than nonemployment life" test, a claimant must still establish medical causation. *Zessin v. Shanahan Mechanical & Elec.*, 251 Neb. 651, 558 N.W.2d 564 (1997). If it is claimed that an injury was the result of stress or exertion in the employment, medical causation is established by a showing by the preponderance of the evidence that the employment contributed in some material and substantial degree to cause the injury. *Id*.; *Leitz v. Roberts Dairy*, 237 Neb. 235, 465

N.W.2d 601 (1991). See, also, *Toombs v. Driver Mgmt., Inc.*, 248 Neb. 1016, 540 N.W.2d 592 (1995).

To establish medical causation, Stacy introduced the expert medical opinion of Dr. Di Maio. As noted, in his report, Dr. Di Maio indicated that he had reviewed depositions of Bolles' coworkers, climatological data, Bolles' medical records, and the ambulance records from the date in question. Dr. Di Maio noted the work performed by Bolles on the date in question, as well as the heat and humidity on the date in question.

Dr. Di Maio opined that the stress of working in direct sunlight and the high temperatures and humidity on the date in question were a contributing cause to Bolles' heart attack and that "[t]he elevated temperature and humidity put stress on [Bolles'] heart as it tried to counteract the environmental factors and maintain normal body temperature."

Dr. Di Maio opined that Bolles' "body would have taken steps to prevent developing severe hyperthermia" and that "[a] large portion of his blood supply would have been shuttled to vascular complexes under the skin." He opined that Bolles' "[h]eart rate and stroke volume would have been elevated" and that "[t]he strain on the heart would have been sufficient to aggravate an existing heart disease and cause death." Dr. Di Maio specifically opined that Bolles' "working in an environment of elevated temperature and humidity was a material and substantial cause in his death."

Although Midwest introduced an opposing expert medical opinion, the compensation court made specific findings and specifically concluded that it found Dr. Di Maio and his opinions to be more credible and entitled to more weight. Thus, the court found that, according to Dr. Di Maio's findings and opinion, sufficient evidence had been adduced to demonstrate medical causation. As previously stated, causation is a factual issue to be determined by the trier of fact, whose determination will not be reversed unless it is clearly erroneous. *Zessin v. Shanahan Mechanical & Elec., supra*. See *Leitz v. Roberts Dairy, supra*.

We conclude that the compensation court did not clearly err in finding that the evidence was sufficient to establish medical

causation. Midwest's assignment of error to the contrary is without merit.

## V. CONCLUSION

We find no merit to Midwest's assertions on appeal that the compensation court failed to provide a well-reasoned opinion under rule 11 and that the evidence was insufficient to demonstrate legal and medical causation. We affirm.

Affirmed.