IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

HOMSTAD V. BLOCK 21

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

TIMOTHY HOMSTAD, APPELLANT,

V.

BLOCK 21, LLC/WOODBURRY MANAGEMENT COMPANY,
DOING BUSINESS AS COURTYARD MARRIOTT, APPELLEE.

Filed October 29, 2019.    No. A-19-191.

Appeal from the Workers' Compensation Court: J. MICHAEL FITZGERALD, Judge. Affirmed.

Eric B. Brown, of Atwood, Holsten, Brown, Deaver & Spier Law Firm, P.C., L.L.O., for appellant.

Patrick B. Donahue and Dennis R. Riekenberg, of Cassem, Tierney, Adams, Gotch & Douglas, for appellee.

MOORE, Chief Judge, and PIRTLE and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Timothy Homstad appeals the determination of the Nebraska Workers' Compensation Court that the injuries to his knees, which he sustained in an accident occurring within the course and scope of his employment, and his resulting surgeries did not cause a blood clot in his sinus cavity. We affirm the judgment of the Workers' Compensation Court.

## II. STATEMENT OF FACTS

On August 20, 2015, Homstad suffered injuries to both of his knees which he sustained in an accident occurring in the course and scope of his employment with Block 21, LLC/Woodbury

Management Company, doing business as Courtyard Marriott (Block 21). Due to these injuries, Homstad underwent surgery on both of his knees. Surgery on his left knee resulted in Homstad developing deep venous thrombosis (DVT) in his left leg on February 1, 2016, and a pulmonary embolism which was diagnosed on February 2, 2016. Surgery on his right knee resulted in DVT diagnosed in August 2016.

By February 2017, Homstad developed additional right lower extremity pain and swelling. A Doppler ultrasound revealed "near occlusive thrombus" in his right leg and his medication was changed. A repeat Doppler ultrasound conducted in March revealed the remaining presence of a blood clot in his left leg. In July, Homstad had a third surgery to remove a tibial button from a prior surgery. By September, Doppler ultrasound testing revealed the presence of partially occlusive deep vein thrombosis, or blood clots, in both his right and left legs.

As pertinent to Homstad's clotting, Dr. Erik Avery, a hematologist who served as Homstad's primary care physician, opined in an October 2017 report:

> I have reviewed [Homstad]'s pertinent previous notes. Unfortunately, he continues to have difficulty with symptoms related to shortness of breath and additional symptoms related to his prior blood clots. I agree with previous assessments that the knee injury followed by surgery caused his DVT's which ultimately caused a pulmonary embolism. Once a person has a blood clot, the risk of developing subsequent blood clots are significantly higher due to the first episode. He continues to have symptoms related to shortness of breath from his pulmonary embolism and I feel that his ongoing DVT issues and shortness of breath are most likely related to the inciting event. Previous workup has not shown any other pre-existing condition.

In a February 12, 2018, treatment note, following an approximate 1-month period where Homstad failed to take his anticoagulation blood thinner, Dr. Avery wrote "I stressed to [Homstad] that it is imperative that he remain on anticoagulation everything all day without interruptions and as previously discussed he understands that he needs to stay on anticoagulation for the rest of his life." Repeat Doppler ultrasounds completed in February 2018 revealed that the right- and left-leg clot conditions remained unchanged in relation to the ultrasound studies taken in September 2017.

On March 1, 2018, Homstad experienced seizure activity and went to the hospital. Shortly thereafter, he returned to the hospital with similar symptoms and was admitted from March 6 through 10, during which time he was diagnosed with superior sagittal sinus thrombosis (SSST), a type of blood clot in his sinus cavity. Upon his release from the hospital, Homstad had four additional seizures related to his SSST and he was readmitted to the hospital from March 11 through 14. Following his discharge on March 14, Homstad continued to experience seizures.

1. TRIAL

Trial in this matter was held in May 2018. At trial, the parties stipulated to the following: (1) Homstad sustained bilateral injures to his knees from an August 20, 2015, accident arising out of and in the course of his employment with Block 21; (2) as a result of Homstad's injuries, surgery was necessitated for both of his knees bilaterally, first left, then right; (3) as a result of his first knee surgery, Homstad developed blood clots in his left lower extremity and a pulmonary

embolism; and (4) Homstad is entitled to ongoing and future medical care for his bilateral knee injuries, as well as blood thinners for causally related clotting issues. The parties also generally stipulated to notice, average weekly wage, periods of disability, that Homstad had not reached maximum medical improvement regarding his blood clotting condition, and that Block 21 did not have permanent work available for Homstad with his limitations.

As relevant to this appeal, the issue tried to the court was whether Homstad's SSST condition and resulting seizures and treatment in March 2018 were causally linked to his compensable injures. At trial, the Workers' Compensation Court received opinions from three doctors regarding the causation issue: Dr. Eric Avery, Dr. Cythia Lewis, and Dr. Peter Silberstein. Relevant portions of the doctors' opinions are noted below.

### (a) Dr. Eric Avery

Dr. Avery, who we previously quoted as linking Homstad's leg and prior blood clotting issues to the 2015 accident opined as follows:

The superior sagittal sinus thrombosis (SSST) etiology is less clear. Studies show these are often younger patients (mean around 40yo), female, or have pregnancy, malignancy, infection or associated with a hematologic predisposition or certain medications. But ballpark of <20% of the time, an etiology is not identified. Out of those typical risk factors, his main risk is his previous clots. SSST are associated with seizures in the literature, but I will defer to neurology's opinion as to the cause and effect of this particular thrombosis based on the size, location, and other characteristics.

In addition, [Homstad] stated his anticoagulation was not authorized by his insurance for a few weeks in Dec 2017 and into Jan 2018. When his blood was drawn on 1/25/2018, it is noted that his Ddimer (a blood test showing breakdown of blood clot) was significantly elevated. Upon restarting the anticoagulation, his Ddimer was back to normal by 2/19/2018. The reason that is important is because he was at a very high risk of recurrent thrombosis. Not being on a blood thinner during that time increases the risk of blood clots, and they don't have to appear in the same location. A SSST could occur because of his overall hematologic predisposition.

His previous blood clots could be a factor in his SSST. He has multiple risks for recurrent blood clots, so he does need lifelong anticoagulation.

### (b) Dr. Cynthia Lewis

Dr. Lewis, a hematologist at Heartland Hematology Oncology in Kearney, Nebraska, opined as follows:

Regarding the etiology of [Homstad's] thrombosis, that is very difficult to determine. Although testosterone replacement therapy can be associated with a[n] elevated erythrocyte count which increases the Hematocrit. However, various blood draw at different times, has shown his HCT to be 49-50 which was in the laboratory normal range. [S]everal of these times, his testosterone level was in the low to lower normal range. He has been on testosterone since ~6/2012 and didn't have any trouble with thrombosis from

starting the replacement therapy until he had [his] leg surgically manipulated and immobilized. There is really no way to prove that his testosterone therapy caused his clots especially with his circumstances. [He] has had an extensive evaluation for thrombophilia including, factor v leiden, prothrombin gene mutation, JAK-2, PHN flow cytometry, protein C and S, and lupus anticoagulant. His IgM anticardiolipin antibody was mildly elevated in 8/2017 at 19, and I haven't seen this repeated, however, I didn't have all of his records. That being said, a level [of] 19 is not a significantly elevated value.

Testosterone itself can cause thrombosis in pts without a high HCT, however, it is unclear if this population of patients had an underlying thrombotic disorder prior to starting testosterone.

Reviewed the patient's history and labs that were available to me with the patient. I do believe that his knee injury requiring immobilization and surgical intervention was the contributing factor in him developing his deep vein thrombosis and pulmonary embolism. After the first predisposed thrombotic episode, limited anticoagulation was reasonable. After the second thrombotic event even that he had predisposing event, lifetime anticoagulation was reasonable recommendation. Then after having a DVT in both legs that was incompletely dissolved, and the recurring thrombosis in his legs and especially with this recent event of sagittal sinus thrombosis, there is no question he will need indefinite anticoagulation.

As a supplement to that report, Dr. Lewis then issued the following opinion:

It would be very difficult for me to find an association with the patient's initial injury at work to him having seizures and developing a thrombosis in his sagittal sinus . . . . Within a reasonable degree of certainty, the seizures and the sagittal sinus thrombosis, [were] not caused by the patient's injury dating back to August 2015 or the surgeries that were performed addressing those injuries subsequent to August 2015.

(c) Dr. Peter Silberstein

Dr. Silberstein, a professor of internal medicine and chief in hematology/oncology at Creighton University, explained in his written opinion:

1. I agree and concur with the opinion from all of the other doctors who have evaluated this issue that Mr. Homstad's knee injury which required immobilization and surgical intervention was the major contributing factor for his initial development of blood clotting in the form of a deep vein thrombosis and a pulmonary embolus.

2. Mr. Homstad's history of clots stemming from the inciting surgical event to his knee was the most significant cause of the development of the recent superior sagittal sinus thrombosis and associated seizure activity that resulted in Mr. Homstad's hospitalizations at Bryan in March 2018. Mr. Homstad had a negative hypercoaguable workup, thus he had no congenital or genetic cause to predispose him to having clots [sic] Moreover, prior to his knee injury, he never had a clot which shows that he developed clots only after the knee injury and not before. Additionally, once Mr. Homstad suffered clotting, his risk went up

significantly for additional clotting due to that history. This additional risk is the reason why blood thinners continued to be prescribed for Mr. Homstad after he first sustained clots. Subsequent and associated clotting does not always occur in the same place.

3. Regarding his treatment and care moving forward, Mr. Homstad is over 120 kg. None of the new anticoagulant drugs such as Xarelto or Apixaban have been shown to be effective in patients of his weight. He weighs 343 lbs or 155 kg. The most effective drug would be Coumadin. But this is difficult drug to manage, which requires frequent blood monitoring as well a special diet.

## 2. TRIAL COURT'S ORDER

Following the trial, the Workers' Compensation Court found that the work accident caused or contributed to Homstad's DVT's in both legs which resulted in his pulmonary embolus and permanent anticoagulation therapy. However, the court held that Homstad's SSST and resulting seizure activity were not causally linked by the compensable injuries. In so finding, the court held:

> With regards to the SSST, it was not caused by nor contributed to be caused by the accident of August 20, 2015. While Dr. Sil[b]erstein states that plaintiff had a history of blood clots stemming from the initial cervical (sic) event to his knees was the most significant cause of the development of the recent SSST and associated seizure activity, the contrary opinions of Dr. Clark and the lack of a clear opinion from Dr. Avery, there is insufficient evidence to find that the SSST was caused by or contributed to be caused by the accident on August 20, 2015.

Homstad appeals from this portion of the judgment of the court.

## III. ASSIGNMENT OF ERROR

Homstad contends that the trial court erred in finding that his treatment on and after March 1, 2018, for a blood clot in his sinus cavity, and associated seizure symptoms, was noncompensable.

## IV. STANDARD OF REVIEW

Under Neb. Rev. Stat. § 48-185 (Cum. Supp. 2018), the judgment made by the compensation court shall have the same force and effect as a jury verdict in a civil case and may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Bower v. Eaton Corp.*, 301 Neb. 311, 918 N.W.2d 249 (2018); *Coughlin v. County of Colfax*, 27 Neb. App. 41, 926 N.W.2d 675 (2019).

Determinations by a trial judge of the Workers' Compensation Court will not be disturbed on appeal unless they are contrary to law or depend on findings of fact which are clearly wrong in light of the evidence. *Gimple v. Student Transp. of America*, 300 Neb. 708, 915 N.W.2d 606

(2018); *Coughlin v. County of Colfax, supra*. In reviewing workers' compensation cases, this court is not free to weigh the facts anew; rather, we accord to the findings of the compensation court the same force and effect as a jury verdict in a civil case. *Bower v. Eaton Corp., supra*; *Coughlin v. County of Colfax, supra*. In testing the sufficiency of the evidence to support the findings of fact, an appellate court considers the evidence in the light most favorable to the successful party, every controverted fact must be resolved in favor of the successful party, and the appellate court gives the successful party the benefit of every inference reasonably deducible from the evidence. *Coughlin v. County of Colfax, supra*; *Kaiser v. Metropolitan Util. Dist.*, 26 Neb. App. 38, 916 N.W.2d 448 (2018).

## V. ANALYSIS

Homstad challenges the finding of the Workers' Compensation Court that his SSST condition and associated seizures first arising in March 2018 were not caused by the 2015 injury to Homstad's knees. A finding in regard to causation of an injury is one for determination by the compensation court as the finder of fact. *Weyerman v. Freeman Expositions*, 26 Neb. App. 692, 922 N.W.2d 246 (2018).

The trial judge in a workers' compensation case is entitled to accept the opinion of one expert over another. *Michie v. Anderson Builders*, 22 Neb. App. 731, 859 N.W.2d 906 (2015). See *Lowe v. Drivers Mgmt., Inc.,* 274 Neb. 732, 743 N.W.2d 82 (2007). We will not substitute our findings of fact for those of the compensation court when its findings are substantiated by the record. *Michie v. Anderson Builders, supra*. See *Clark v. Alegent Health Neb.,* 285 Neb. 60, 825 N.W.2d 195 (2013). Accordingly, in connection with this specific assignment of error, this appellate court is limited to determining whether the court's causation determination is supported by the evidence. We find that there is support for the court's factual determination.

In short, the court was asked to determine whether Homstad's 2015 knee injuries, surgeries, and resulting blood clots caused or contributed to Homstad's 2018 sinus condition and associated seizures. In connection with like causation questions, the Nebraska Supreme Court in *Hohnstein v. W.C. Frank,* 237 Neb. 974, 980, 468 N.W.2d 597, 602 (1991), previously held: "It is well established that 'unless the character of an injury is plainly apparent, an injury is a subjective condition, and an expert opinion is required to establish the causal relationship between an incident and the injury as well as any claimed disability consequent to such injury.'" Clearly, the issue of whether a sinus clotting condition suffered over 2½ years after Homstad's knee injuries required expert analysis in order to establish causation.

In connection therewith, the court received and reviewed three separate medical opinions on the subject. Dr. Silberstein opined that the sinus clotting was caused or linked to the 2015 knee injuries and resulting clotting conditions. Conversely, Dr. Lewis specifically opined that, to a reasonable degree of medical certainty, Homstad's sinus condition was not related. And finally, Dr. Avery, Homstad's treating physician, opined that the issue presented a difficult question and that, although he believed the condition "could" have been caused by the original accident and injuries, it was "very difficult to determine." Regardless of whether Dr. Avery's opinion could be read to provide support for Homstad's position, there is no question that Dr. Lewis affirmatively opined that the sinus condition was not linked to the original accident and injury. At a minimum,

Dr. Avery's testimony establishes that the issue presents a difficult medical question lending some credence to Dr. Lewis' ultimate opinion in the matter. Although the Workers' Compensation Court refers in its order to the opinion of "Dr. Clark" as supporting its finding, we find that was a scrivener's error in that the opinion referenced by the court was offered by Dr. Lewis. Because we find that there is adequate support in the record from Dr. Lewis to substantiate the factual conclusion reached by the trial court, we are precluded from substituting our own view of the facts for that of the Workers' Compensation Court.

Homstad argues that this issue should be controlled by the Nebraska Supreme Court's pronouncement in *Rosemann v. County of Sarpy*, 237 Neb. 252, 466 N.W.2d 59 (1991). In *Rosemann*, the Supreme Court referenced the claimant's reliance on the following proposition expressed in 1 A. Larson, The Law of Workmen's Compensation § 13.00 at 3-502 (1900): "When the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment, unless it is the result of an independent intervening cause attributable to claimant's own intentional conduct." *Rosemann v. County of Sarpy*, 237 Neb. at 258, 466 N.W.2d at 63. In that regard, Homstad argues that there was no evidence of an independent intervening cause which led to Homstad's sinus condition and, consequently, there was an insufficient factual record to support the court's decision. However, the Nebraska Supreme Court, in relation to the same principle, went on to explain:

> In his treatise, Professor Larson notes a group of medical-causation cases "in which the existence of the primary compensable injury in some way exacerbates the effects of an independent medical weakness or disease. The causal sequence in these cases may be more indirect or complex, but as long as the causal connection is in fact present the compensability of the subsequent condition is beyond question." 1 A. Larson, *supra,* § 13.11(b) at 3-523 to 3-524.

*Rosemann v. County of Sarpy*, 237 Neb. at 258-59, 466 N.W.2d at 63.

Accordingly, contrary to Homstad's argument, even when ascertaining the compensability of natural consequences that follow from an injury, the claimant remains obligated to establish the causal connection of the subsequent condition. As such, in order to recover for Homstad's sinus condition, as a "natural consequence that follows from injury," it remained Homstad's burden to show that the causal connection was present. Here, there was conflicting evidence as to whether that condition was, in fact, a natural consequence of Homstad's original injury and as we previously explained, the court's finding that Homstad's sinus condition was not a natural consequence that followed from the 2015 injury was adequately supported by the record. As such, Homstad's assignment of error fails.

## VI. CONCLUSION

Having found that the record supports the Workers' Compensation Court's factual determination that Homstad's sinus condition was not linked to his original accident and injury, the order of the Workers' Compensation Court is affirmed.

AFFIRMED.